## State of Vermont v. Robert "Sonny" Bailey

[475 A.2d 1045]

No. 82-329

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed January 27, 1984

88

*John J. Easton, Jr.,* Attorney General, and *Robert V. Simpson, Jr.,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Nancy E. Kaufman,* Montpelier, for Defendant-Appellant.

Gibson, J. Defendant was convicted after trial by jury of two counts of sexual assault in violation of 13 V.S.A. § 3252(3). His appeal from the judgment of the District Court, Unit No. 2, Chittenden Circuit raises four issues: (1) whether the prosecution's failure to produce certain evidence was a denial of defendant's due process right to a fair trial; (2) whether the prosecutor's failure to elect the specific offense upon which it sought conviction for sexual assault was error; (3) whether the prosecutor's final argument to the jury denied defendant his right to a fair trial; and (4) whether his counsel's written waiver of jury sequestration was effective absent defendant's personal consent. We affirm the judgment of the district court.

Defendant was found guilty of engaging in sexual acts with a person under the age of sixteen to whom he was not married. 13 V.S.A. § 3252(3). A "sexual act" is defined in 13 V.S.A. § 3251. The alleged acts occurred on the afternoon of December 19, 1981, during a one-and-one-half-hour period in defendant's apartment. After the alleged incidents occurred, the complaining witness, a twelve-year-old girl, was taken to a hospital for a physical examination. A test administered immediately showed the presence of no motile (live) sperm. A "rape kit" consisting of clothing worn by the complainant and specimens of oral and vaginal secretions was also assembled by the hospital and given to the police for further testing by the police crime laboratory. Law enforcement officials obtained a war-

rant for a search of defendant's apartment. Two days after the incident the police seized sheets and blankets from defendant's bed as well as several other items of evidence.

In response to a pretrial discovery order, the State sent a supplemental discovery letter on January 8, 1982, which listed the following evidence in its possession: clothes collected from the complaining witness by police and hospital personnel, the rape kit, assorted bed linens, other items taken from defendant's bedroom and reports of medical personnel. On April 27, 1982, however, the State sent another supplemental discovery letter that failed to list any tangible evidence. In response to repeated requests, defense counsel was continually assured by the state's attorney's office that tests were being conducted upon these items and results would be forthcoming. On Friday, April 30, 1982, defense counsel was apprised that the State did not know where the tangible evidence was, whether any tests had in fact been made or where the results were located.

On the following Monday, during a pretrial conference, the defense moved to dismiss. In its motion and during oral argument on the record, counsel contended that defendant was prejudiced by the State's failure to conduct testing calculated to show the presence of sperm and other substances on the seized bedding. Evidence contained in the sealed rape kit assembled at the hospital was similarly untested. Defendant maintains this failure is prejudicial because the motile sperm test conducted at the hospital was negative, and therefore these tests too were presumably negative and exculpatory. During the pretrial conference, the trial court stated that "there is [no] requirement that the State has to do certain tests," that defendant's unauthorized departure from the jurisdiction during the bail period contributed to the lack of testing and that any further evidence resulting from testing of the sheets was too remote to be clearly exculpatory. The court believed that testimony of the attending physician establishing the lack of motile sperm one and one-half hours after the incident was all the evidence the defense was "entitled to have that could possibly be exculpatory." That same morning, defense counsel was informed that the other evidence was not lost but was in physical custody of the police—no tests, however, had been conducted.

The motion to dismiss was denied and the case proceeded to trial on Tuesday, May 4, 1982.

I.

■ Defendant first argues the state's attorney negligently failed to preserve and furnish potentially exculpatory evidence required by the defense. *Brady* v. *Maryland,* 373 U.S. 83 (1963), requires a prosecutor to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment . . . ." *Id.* at 87. Vermont Rule of Criminal Procedure 16(b)(2) has codified the *Brady* rule and requires the disclosure of material that "tends to negate the guilt of the defendant . . . or would tend to reduce his punishment therefor." V.R.Cr.P. 16(b)(2), Reporter's Notes. Suppression of such exculpatory evidence is a violation of the Due Process Clause of the Fourteenth Amendment. *Brady, supra,* 373 U.S. at 86.

A.

The State admits, at the outset, that representations were mistakenly made to appellant indicating test results were forthcoming, but maintains the evidence in question was not lost. Therefore, during the pretrial conference, defense counsel should have requested a continuance in order to carry out the tests it desired. This failure, the State argues, is tantamount to a waiver.

Although defense counsel vigorously pursued its pretrial motion to dismiss based upon the unavailability of the test results and moved for a judgment of acquittal based upon this argument at the close of the State's case, a continuance was not requested. In response to an inquiry from the court, the parties expressed uncertainty as to whether some of the evidence held by the police was too old to test. Ultimately, however, the trial court decided that the defense had "everything [it was] entitled to have that could possibly be exculpatory," that it had not "lost anything" but had the "vital test; the one that shows no motile sperm." Defense counsel may have felt it futile to move for a continuance given the trial court's perceived opposition. We cannot now say, however, that such a motion, if made, would have been denied.

■ The granting of a continuance by the trial court is a matter of discretion. *State* v. *Rickert,* 124 Vt. 380, 382, 205 A.2d 547, 549 (1964). We have previously noted that in some situations it is counsel's responsibility to ask for a continuance, *State* v. *Richards,* 144 Vt. 16, 21–22, 470 A.2d 1187, 1190–91 (1983) (counsel failed to accept court's offer for a continuance when confronted with newly discovered evidence) ; *State* v. *Dezaine,* 141 Vt. 335, 338, 449 A.2d 913, 914 (1982) (a continuance should have been sought to locate a witness and to obtain his testimony). This responsibility exists even though counsel may feel the motion will not be successful.

Although counsel should have moved for a continuance if he wished the materials tested, in light of all the circumstances, we cannot say the defense waived its right to argue this alleged violation of *Brady* v. *Maryland* on appeal. Cf. *United States* v. *Millet,* 559 F.2d 253, 256–57 (5th Cir. 1977), *cert. denied,* 434 U.S. 1015 (1978) (government failed to deliver *Brady* material but defendant waived right to complain by failing to ask for a continuance, to request the trial judge to consider the matter, to object during trial or to take any action at all until after the trial had concluded). Unlike the situation in *State* v. *Mecier,* 138 Vt. 149, 156–57, 412 A.2d 291, 296 (1980), this is not a case in which the defendant failed to bring the discovery issue to the attention of the trial court. We, therefore, will address the merits of defendant's argument.

Although the evidence in this case is not actually lost, the State concedes it is responsible for the fact that no tests were conducted during the four-month period prior to trial. Test results were not available for trial and, therefore, we will treat the omitted evidence as lost.

### B.

The State also argues that because the testing was never done it is impossible to know whether the results would be exculpatory; because they have not been deemed exculpatory, they are not subject to *Brady* disclosure.

■ When evidence has been lost or remains untested "there is often no way for a defendant to ascertain the true extent of its exculpatory nature." *State* v. *Vaster,* 99 Wash. 2d 44, 52, 659 P.2d 528, 533 (1983). It may well be impossible for a criminal

defendant to prove the exculpability of lost evidence, and such a requirement would not further the *Brady* duty to disclose. In an extreme case, a prosecutor would be able to suppress potentially exculpatory evidence by pleading its loss.

> Were *Brady* and its progeny applicable only when the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.

*United States* v. *Bryant*, 439 F.2d 642, 648 (D.C. Cir. 1971) (*Bryant I*). Therefore, when evidence is not available a defendant does not have to prove the evidence would be exculpatory but must show only a "reasonable possibility" that it would have been favorable. *People* v. *Newsome*, 136 Cal. App. 3d 992, 1002, 186 Cal. Rptr. 676, 681 (1982) ; *State* v. *Vaster*, *supra*, 99 Wash. 2d at 52, 659 P.2d at 532–33.

We find defendant has shown a reasonable possibility that further tests of physical evidence would be favorable to him. Tests done at the hospital showed the presence of no motile sperm, and there is a reasonable possibility that other evidence seized would also yield no positive test results. The possibility that the test results "might have been significantly 'favorable' to the accused" is enough to bring this case within the constitutional protections of *Brady* v. *Maryland, supra*, and of V.R.Cr.P. 16 (b) (2). *Bryant I, supra*, 439 F.2d at 648. We also note the parties agree that whether a due process violation has occurred may be determined in light of *Brady* and its progeny. The question that arises is whether the failure to test this tangible evidence, after continual representations by the prosecutor that tests were being conducted, amounts to the illegal suppression of potentially exculpatory evidence.

### C.

 "[L]ost evidence cases are essentially permutations of failure-to-disclose cases," and derive from principles developed in *Brady, supra. Armstrong* v. *Collier*, 536 F.2d 72, 77 (5th Cir. 1976). In a leading case, *Bryant I, supra*, 439 F.2d at 651, the Court of Appeals for the District of Columbia held that the "duty of disclosure attaches in some form once the

Government has first gathered and taken possession of the evidence in question." *Id.* at 651. Before a "request for discovery has been made, the duty of disclosure is operative as a duty of preservation." *Id.* In cases in which the evidence is not preserved, the government will be required to show that it made " 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made." *Id.* To demonstrate a good faith effort, *Bryant I* imposes a burden upon the State to show that it follows "rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation." *Id.* at 652. The sanctions for this type of nondisclosure depend upon the degree of culpability of the government. *Id.* at 653. Although an exception may be made for good faith loss, negligence will be no excuse. *Id.* Whether an indictment against a defendant will be dismissed depends upon "a pragmatic balancing" of three factors: (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial. *Id.*; see also *United States* v. *Loud Hawk,* 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring), *cert. denied,* 445 U.S. 917 (1980) ; *United States* v. *Picariello,* 568 F.2d 222, 227 (1st Cir. 1978) ; *Armstrong* v. *Collier, supra,* 536 F.2d at 78; *Deberry* v. *State,* 457 A.2d 744, 752 (Del. 1983).

The State concedes "a negligent failure to communicate with the Burlington Police on the status of the tests . . . ." Although the State may not have a duty to test evidence in the absence of a defense request, it may not "impose any material obstacle in the path of the accused or frustrate his reasonable efforts designed to produce probative evidence." *People* v. *Newsome, supra,* 136 Cal. App. 3d at 1006, 186 Cal. Rptr. at 684. Where the prosecution has notified the defense of existing evidence and the "defense fails in a timely fashion to avail itself of the evidence," the prosecution cannot be held responsible for its loss or deterioration. *Id.* Criminal defendants may well have a duty to request an independent analysis. See *State* v. *Hamele,* 188 Conn. 372, —, 449 A.2d 1020, 1024 (1982) ; *State* v. *Hudson,* 56 N.C. App. 172, 178, 288 S.E.2d 383, 386 (1982). In this case, however, the defense was notified of the existence of tangible evidence and was told

explicitly that the State intended to test it. Indeed, the test results were repeatedly promised. The absence of test results, therefore, cannot be ascribed to the failure of the defense to order its own tests but only to admitted negligence in the procedures of the State. We cannot conclude that the State made "earnest efforts" to produce the test results it had promised.

The State argues that a contributing factor to the lack of testing was defendant's absence from the jurisdiction during a portion of the four-month period between arraignment and trial. As a result, tests could not be completed because nontestimonial evidence from defendant was needed for the purpose of comparison. He was present, however, for several days immediately after arraignment and then from February 12, 1982, until May 4, 1982, the day of trial. Thus, he was available for an ample amount of time, and we cannot excuse the State's negligence on this basis.

Defendant, however, fails to persuade this Court as to the second and third *Bryant* factors. The lost evidence must be important to his defense. Defendant argues that if tests had been conducted on the sheets removed from his bed, they would not show the presence of sperm or other substances. This absence could be important because it would tend to undermine complainant's testimony concerning pertinent events and could adversely affect the jury's estimation of her credibility.

We find such potential test results to be relevant. However, they do not rise to the level of "importance" demanded by *United States* v. *Bryant,* 448 F.2d 1182 (D.C. Cir. 1971) (*Bryant II*). The bed linens were not seized from defendant's apartment until December 21, 1981, two days after the alleged incident occurred. Due to the time lapse, any evidence found on the sheets cannot be conclusively linked to the alleged acts. In the absence of positive test findings, it could also be argued that the sheets seized were not the same sheets as were present on the bed during the incident. Any exculpatory test results would lack probative value and reliability and are not "important" evidence crucial to defendant's case.

The third *Bryant* factor requires consideration of other evidence of guilt adduced at trial. *Bryant II, supra,* 448 F.2d at 1183; *United States* v. *Loud Hawk, supra,* 628 F.2d at 1152; see also *Armstrong* v. *Collier, supra,* 536 F.2d at 78. The third

*Bryant* factor requires appellant to show he was prejudiced at trial—that the inclusion of the test results, if exculpatory, would have "create[d] a reasonable doubt that did not otherwise exist . . . ." *United States* v. *Agurs*, 427 U.S. 97, 112 (1976) ; see also *Commonwealth* v. *Williams*, 295 Pa. Super. 369, 374–75, 441 A.2d 1277, 1280 (1982).

At trial, defendant elicited testimony from the examining physician indicating the absence of motile sperm soon after the alleged incident took place. We cannot say that similar results indicating an absence of sperm on defendant's sheets seized two days after the incident would have created any additional doubt as to defendant's guilt in the minds of the jurors. "[T]he omission must be evaluated in the context of the entire record." *United States* v. *Agurs, supra,* 427 U.S. at 112. We note there was strong evidence of defendant's guilt in this case. He made several damaging admissions to the arresting officer concerning his presence and conduct during the incident. He admitted to the officer that "he knew she was too young to be with him." We also note the fact that the complaining witness took the stand herself and testified in detail to the events of that day.

■■■ In conclusion, "we draw a balance between the nature of the State's conduct and the degree of prejudice to the accused." *Deberry* v. *State, supra,* 457 A.2d at 752. Under the "pragmatic balancing" of *Bryant II, supra,* the relative unimportance of the test results, coupled with other strong evidence of guilt adduced at trial, outweigh the State's negligence. 448 F.2d at 1184. See also *United States* v. *Miranda,* 526 F.2d 1319, 1329 (2d Cir. 1975), *cert. denied,* 429 U.S. 821 (1976) (under the pragmatic balancing test, the strength of the case against the defendant and the evidence placed before the jury outweighed the State's negligence). We cannot say the absence of laboratory tests in this case resulted in a denial of defendant's due process rights under *Brady* v. *Maryland, supra,* and V.R.Cr.P. 16 (b) (2).

## II.

Defendant next argues his conviction on count I must be reversed because the State presented testimony that the prohibited contact occurred on at least six occasions and then

failed to elect the act upon which it sought conviction. Relying on *State* v. *Willett,* 78 Vt. 157, 62 A. 48 (1905), defendant contends there were multiple acts involved, each of which could have constituted a separate offense. As the information and supporting affidavit alleged only one act of sexual assault, there is no assurance that the jurors, when weighing the evidence, would agree whether the defendant had performed a specific act. The danger is that some jurors will convict upon evidence of one act and the balance upon evidence submitted for other acts. There will be no unanimous verdict as to defendant's guilt in regard to the single offense charged. An analogous danger, defendant argues, is that jurors will be swayed by the quantum of proof introduced as to all the acts when, in fact, there has been insufficient proof on any one of the alleged acts standing alone.

Defendant contends the court's failure to require such election together with the failure to give a limiting instruction to the jury is plain error. No objection or request to charge was made at trial. V.R.Cr.P. 52 (b).

■ As a general rule, where the information alleges one unlawful act and the evidence reflects two or more such acts, the State can obtain only one conviction and should be required to elect which act it will rely upon for conviction. *State* v. *Willett, supra,* 78 Vt. at 159, 62 A. at 49; 23 C.J.S. *Criminal Law* § 1044(b) (1), at 1181. An exception to this rule exists, however, where the specific acts are so related as to constitute but one entire transaction, or one offense. *People* v. *Mota,* 115 Cal. App. 3d 227, 234, 171 Cal. Rptr. 212, 215 (1981); *Turnbow* v. *State,* 451 P.2d 387, 389–90 (Okla. Cr. App. 1969); *Steele* v. *State,* 523 S.W.2d 685, 687 (Tex. Crim. App. 1975); 23 C.J.S. *Criminal Law* § 1044(b) (2), at 1182.

Defendant cites several cases in which the prosecution was required to elect the act upon which it intended to rely for a conviction. We note, however, that in each of these cases the acts complained of occurred some time apart. See, e.g., *People* v. *Creighton,* 57 Cal. App. 3d 314, 317–18, 129 Cal. Rptr. 249, 252 (1976) (numerous acts occurred within a one-year period of time); *Louis* v. *State,* 222 P.2d 160, 162 (Okla. Crim. App. 1950) (acts occurred in morning, again in evening and one

week later) ; *State* v. *Willett, supra*, 78 Vt. at 160, 62 A. at 49 (five or six incidents occurred during a two-week period).

The many acts of sexual conduct here were so related as to constitute but one event. See, e.g., *People* v. *Mota, supra*, 115 Cal. App. 3d at 233, 171 Cal. Rptr. at 215 (many continuous acts all committed within an hour's time in the back of a van constituted one felonious act) ; *Turnbow* v. *State, supra*, 451 P.2d at 389–90 (acts were committed within a span of a few minutes and constituted a single offense) ; *Steele* v. *State, supra*, 523 S.W.2d at 687 (two sexual acts committed two hours apart were part of the same criminal transaction).

We find this position compelling for several reasons. The alleged acts in this case all occurred within the span of one and one-half hours in defendant's apartment. As in *People* v. *Mota, supra*, 115 Cal. App. 3d at 233, 171 Cal. Rptr. at 215–16, "the acts complained of were perpetrated on the same occasion and within a few minutes of each other, and constituted one continuous felonious act." Moreover, "it would have been unreasonable to compel the prosecution and the . . . dazed victim to delineate with specificity each act . . . where she was being repeatedly and continuously . . . assaulted . . . ." *Id*. at 233–34, 171 Cal. Rptr. at 216.

■ There was no plain error in the court's failure to require an election or to issue limiting instructions. Defendant's right to a fair trial has not been abridged.

### III.

Defendant's third argument challenges the propriety of the State's closing argument to the jury. Portions of the argument, defendant believes, constituted a sustained and unremitting appeal to the passion, prejudice, and sympathy of the jury.

■ It is important to note that defense counsel did not object to the closing argument or request specific curative instructions. We will not, even in criminal cases, consider questions not raised in the court below, *State* v. *Billado*, 141 Vt. 175, 182, 446 A.2d 778, 785 (1982), "unless the error is a glaring error so grave and serious that it strikes at the heart of a defendant's constitutional rights." *Id*. (citing *State* v.

*Kasper*, 137 Vt. 184, 190–91, 404 A.2d 85, 89 (1979)). Comments made during a closing argument must be "manifestly and egregiously improper" before this Court will address them under the glaring or plain error doctrine. *State v. Moran*, 141 Vt. 10, 20, 444 A.2d 879, 884 (1982) (citing *State v. Trombley*, 136 Vt. 333, 335–36, 388 A.2d 433, 435 (1978)).

The record reveals that the prosecutor, during the rebuttal portion of her closing argument, did stray from commonly accepted form. She suggested to the jury that they "think of what you would do if that happened to you. Would you have the courage . . . to go in and tell someone that this is what happened. . . ." Defendant contends this is the so-called "golden rule" argument, *Bisbee v. Ruppert*, 306 Minn. 39, 47, 235 N.W.2d 364, 370 (1975); *Burgstahler v. Fox*, 290 Minn. 495, 496, 186 N.W.2d 182, 184 (1971), in which counsel asks members of the jury to put themselves in the place of the victim. We have found such an appeal to the prejudices of the jury to be "a lamentable departure from the rule which [requires] counsel to confine [her] argument to the evidence in the case . . . ." *Duchaine v. Ray*, 110 Vt. 313, 321, 6 A.2d 28, 32 (1939).

Defendant also argues that the prosecutor improperly attacked defense counsel for impeaching the complainant and urged the jury to be proud of her. "Ladies and gentlemen, we should be proud of that little girl. We shouldn't be calling her a liar."

We have previously stated that "counsel have an obligation as officers of the court to conduct themselves in a manner which will insure justice . . . ." *State v. Lapham*, 135 Vt. 393, 406, 377 A.2d 249, 257 (1977). Although a "prosecutor has a duty to present the State's case with earnestness and vigor . . . there is also a corresponding duty to refrain from improper methods . . . and to guard against conduct unintentionally trespassing the bounds of propriety." *Id.* Whether a closing argument so exceeds the bounds of propriety as to produce reversible error must be determined "in the context of the entire argument," *id.* at 407, 377 A.2d at 257, and "there is usually little profit in comparing one case with another . . . ." *Id.* The burden of proving prejudice is on the defendant. *Id.*

Although counsel's rebuttal argument did exceed the

bounds of propriety, we do not believe the argument was so improper as to require a new trial. See *State* v. *Slocum*, 132 Vt. 476, 479–80, 321 A.2d 51, 54 (1974) ; *State* v. *Bishop*, 128 Vt. 221, 230, 260 A.2d 393, 399 (1969) ; *Duchaine* v. *Ray, supra*, 110 Vt. at 321, 6 A.2d at 33. See also *Bisbee* v. *Ruppert, supra*, 306 Minn. at 47, 235 N.W.2d at 370–71 (improper closing remarks, including "golden rule" argument, not so egregious as to require trial court to give curative instructions on its own motion). Prejudicial remarks in closing argument can be corrected by a curative instruction given by the court. *State* v. *Slocum, supra*, 132 Vt. at 479–80, 321 A.2d at 54. Although defense counsel did not request specific curative instructions based upon objections to the closing argument, the court did give pertinent general instructions. The court stated, "You must not be governed or influenced by sympathy or prejudice for or against the defendant or the State. Your verdict must be based on the evidence . . . ."

The unfortunate rebuttal remarks by the State constituted but a small portion of the closing argument. Read in the context of the whole argument and in light of the instruction given by the court, the conduct herein was not so egregious as to plainly offend appellant's right to a fair trial before an impartial jury.

## IV.

Defendant, pro se, makes a fourth argument to the Court. He states that his attorney filed a written "Waiver of Jury Sequestration" without his personal knowledge or consent. The waiver read, in part, that "[d]efendant waives the sequestration of the jury which he understands he is entitled to . . . ." It is the rule in Vermont that complete dispersion of the jury in a felony case "in which the jurors are permitted by the court to pass from under the eye of the officer having them in charge . . . is improper" absent consent by the defendant. *State* v. *Anderson*, 119 Vt. 355, 361, 125 A.2d 827, 831 (1956). He argues the court erred when it allowed the jury to disperse for the evening without also obtaining his personal waiver either written or on the record. Furthermore, this waiver, he believes, should follow only after an explanation by the court of defendant's right to have the jury sequestered during the course of the trial.

Chapter I, Article 10 of the Vermont Constitution provides "That in all prosecutions for criminal offenses, a person hath a right to . . . a speedy public trial by an impartial jury . . . ." The Sixth and Fourteenth Amendments of the United States Constitution also guarantee a defendant the right to trial by an impartial jury. *State* v. *White*, 142 Vt. 73, 75, 451 A.2d 1137, 1138 (1982). "No right is more fundamental to a defendant than a fair trial by jury, and the law is most sensitive to any infringement or impairment of that fundamental and constitutional right." *State* v. *Woodard*, 134 Vt. 154, 158, 353 A.2d 321, 323 (1976).

■ There is no indication that defendant suffered or even suspected any jury bias during his trial. The record is devoid of "any suspicion of extraneous influences." *State* v. *Prime*, 137 Vt. 340, 343, 403 A.2d 270, 272 (1979) (quoting *State* v. *Woodard, supra,* 134 Vt. at 158, 353 A.2d at 323–24). The facts of this case, therefore, are unlike those in *State* v. *Onorato*, 142 Vt. 99, 453 A.2d 393 (1982), and *State* v. *Prime, supra.* In those cases the possibility of jury taint or bias had been raised during trial. We held in *State* v. *Prime, supra,* that, once a suggestion of jury bias has been raised, only the defendant can waive the possible taint. *State* v. *Prime, supra,* 137 Vt. at 343, 403 A.2d at 272. "The right to an unbiased jury is a personal right which may be waived only by the defendant and only with a knowing and intelligent waiver." *Id.* As the defendant in *Prime* was not advised of the possible jury bias, his counsel could not execute, on his behalf, a knowing and intelligent waiver. *Id.*

In this case, however, there was no suggestion of jury bias raised at trial and no waiver of possible prejudice involved. The issue is simply whether counsel for defendant had authority to waive jury sequestration on defendant's behalf and without his knowledge before trial and in the absence of any suggestion of bias on the record.

■ It is a general rule that trial counsel has authority to act on behalf of his client and to control the procedural aspects of his client's case without his client's express consent. *United States* v. *O'Looney*, 544 F.2d 385, 392 n.5 (9th Cir.), *cert. denied*, 429 U.S. 1023 (1976) (attorney waived defend-

ant's right to object to use of special verdicts) ; *Monroe* v. *Monroe*, 177 Conn. 173, 181, 413 A.2d 819, 824 (1979) (counsel agreed to submit to a hearing before a referee) ; *State* v. *Sayers*, 211 Neb. 555, 563, 319 N.W.2d 438, 442 (1982) (counsel waived foundation for exhibits introduced at trial). An intelligent and knowing waiver—" 'an intentional relinquishment or abandonment of a known right or privilege'—need not be applied 'with respect to strategic and tactical decisions, even those with constitutional implications, by a counselled accused.' " *Mildwoff* v. *Cunningham*, 432 F. Supp. 814, 820 (S.D.N.Y. 1977) (citing *Johnson* v. *Zerbst*, 304 U.S. 458 (1938)).

■■ A tactical or procedural waiver executed by an attorney on behalf of his client is binding. *State* v. *Sayers, supra,* 211 Neb. at 563, 319 N.W.2d at 442. The right to jury sequestration, absent an allegation of taint or bias, is not so compelling as to require a personal, affirmative waiver by defendant himself. *United States* v. *DiFronzo*, 345 F.2d 383, 385 (7th Cir. 1965) ; *State* v. *Peeler*, 7 Wash. App. 270, 274, 499 P.2d 90, 92 (1972).

*Affirmed.*